IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

**STATE OF ARIZONA**,
*Petitioner*,

*v.*

**HON. BRYAN B. CHAMBERS, JUDGE OF THE SUPERIOR COURT OF THE STATE OF ARIZONA, IN AND FOR THE COUNTY OF GILA**,
*Respondent Judge*,

**HEATHER ELAINE HENDERSON**,
*Real Party in Interest*.

No.   CR-21-0388-PR
Filed August 7, 2023

Appeal from the Superior Court in Gila County
The Honorable Bryan B. Chambers, Judge
Nos.   S0400CR201800269
S0400CR201900011
S0400CR201900012
**DISQUALIFICATION ORDER VACATED**

Order of the Court of Appeals, Division Two
2 CA-SA 2021-0053
Filed Nov. 16, 2021

COUNSEL:

Bradley D. Beauchamp, Gila County Attorney, Diana L. Kanon (argued), Joseph E. Collins, Deputy County Attorneys, Globe, Attorneys for State of Arizona

Jeffrey B. Cloud (argued), JCloud Law, PLLC, Scottsdale, Attorney for Heather Elaine Henderson

Mikel Steinfeld (argued), Arizona Attorneys for Criminal Justice, Phoenix, Attorney for Amicus Curiae Arizona Attorneys for Criminal Justice

_____

JUSTICE MONTGOMERY authored the Opinion of the Court, in which CHIEF JUSTICE BRUTINEL, VICE CHIEF JUSTICE TIMMER, and JUSTICES BOLICK, LOPEZ, BEENE, and KING joined.

JUSTICE MONTGOMERY, Opinion of the Court:

**¶1** We consider whether a county attorney's prior representation of a criminal defendant creates an appearance of impropriety in a current prosecution, warranting disqualification of an entire county attorney's office, absent a finding that a substantial relationship exists between the two matters. Because the current prosecution for a drug sale offense is not the same nor substantially related to the prior representation in a marriage annulment matter, we hold that there is no appearance of impropriety upon which to disqualify the office.

## I. FACTUAL AND PROCEDURAL BACKGROUND

**¶2** Before 2008, Elaine Henderson (Henderson) married Gary Roberts (Roberts), believing she was divorced from her first husband, Charles Henderson (Charles). While Henderson was in prison for possession of a dangerous drug for sale, she learned that her former sister-in-law sought to have her charged with bigamy because she never finalized her divorce from Charles. Consequently, Henderson's father retained Bradley Beauchamp (Beauchamp) on her behalf to secure an annulment of her marriage to Charles.

**¶3** Beauchamp and Henderson never met in person. They only communicated by telephone and mail. Henderson does not remember much about the representation, but she recalls that she may have received, signed, and mailed documents. She never discussed with Beauchamp why she was in prison or the nature of the underlying charges. She does not remember discussing her relationship with Roberts but believes she must have provided information about his location and their marriage. Eventually, Beauchamp obtained a default annulment and his representation of Henderson ended in 2009.

**¶4**          In 2010, while still in private practice, Beauchamp represented the state in a child support enforcement matter against Henderson. In court and on the record, Beauchamp asked Henderson to waive any potential conflict due to his prior representation in the annulment matter, which she did. In 2012, Beauchamp was elected Gila County Attorney and currently leads the Gila County Attorney's Office ("GCAO").

**¶5**          In May 2018, Henderson was arrested for the transport and possession of methamphetamine for sale. Detective Richard Rosales interviewed Henderson concerning her connection to the Aryan Brotherhood (the "AB") through her husband, Roberts. The purpose of the interview was to determine if Henderson had any information that would make it worthwhile to offer a plea agreement conditioned on her cooperation. Henderson told Detective Rosales that her husband's name was "Grizz," and that he had "probated" under an AB member but was never fully "patched."[1] She also told Detective Rosales that she knew other people affiliated with the AB but did not want to provide their information. Detective Rosales consulted with now County Attorney Beauchamp about offering a plea agreement based on Henderson's information, but no such offer was ever made.

**¶6**          GCAO charged Henderson for the crime of possession of methamphetamine for sale on May 30, 2018, and eventually extended a plea offer with a stipulated thirty-two-year prison term. In early 2019, Henderson filed a motion to disqualify GCAO based upon an appearance of impropriety given Beauchamp's previous representation in the marriage annulment matter. The trial court denied the motion after considering the four-factor inquiry, which is set forth in *Gomez v. Superior Court*, 149 Ariz. 223 (1986):

> (1) whether the motion is being made for the purposes of harassing the defendant; (2) whether the party bringing

---

[1] A "probate" is a prospective gang member. *State v. Riley*, 248 Ariz. 154, 166 ¶ 2 (2020). A full member of a gang is denoted by a signifying tattoo or "full-patch." *See, e.g.*, *United States v. Mongol Nation*, 56 F.4th 1244, 1246 (9th Cir. 2023).

the motion will be damaged in some way if the motion is not granted; (3) whether there are any alternative solutions, or is the proposed solution the least damaging possible under the circumstances; and (4) whether the possibility of public suspicion will outweigh any benefits that might accrue due to continued representation.

¶7        The trial court found: (1) there was no evidence from which it could conclude Henderson made the motion for the purpose of harassment; (2) Henderson would not be damaged by denial of the motion because there was nothing in Beauchamp's previous representation that could be used against her; (3) other alternative solutions to disqualification existed that were less damaging than disqualification;[2] and (4) public suspicion of GCAO's continued prosecution did not outweigh its potential benefits because there was no allegation that GCAO was giving Henderson any preferential treatment.

¶8        Additionally, the court reviewed Ethical Rule ("ER") 1.9 and found that the two cases—the prior annulment matter and the instant prosecution—were not substantially related.   The court therefore concluded that there was no appearance of impropriety and denied Henderson's motion.

¶9        In 2021, Henderson renewed her motion to disqualify GCAO based upon this Court's opinion in *State v. Marner ex rel. Cnty. of Pima*, 251 Ariz. 198 (2021**),** and on new information not previously considered.   In her motion, Henderson theorized that she could have provided confidential information to Beauchamp concerning Roberts' AB affiliation and that this may have caused him to form a poor opinion of her, resulting in him "throw[ing] the book" at her with "extremely harsh" plea offers.

_____

[2] The other possible solution arose in the context of Henderson's concerns about the State's use of a 2003 charge of child abuse or the bigamy situation in 2008 as prior bad acts.   In a minute entry from the first disqualification hearing, the court entered an order "precluding State from mention of prior any 2003 bigamy and/or child abuse allegations for which Defendant was not convicted of."

Henderson also argued that, under *State v. Hursey*, 176 Ariz. 330 (1993), an appearance of impropriety existed due to the potential that, during the prior representation, she and Beauchamp shared a confidential communication regarding Roberts. Accordingly, Henderson asserted that the court should presume prejudice to her and disqualify GCAO.

¶10 The State opposed the renewed motion, arguing that no good cause warranted reconsideration and that the *Gomez* factors did not support disqualification.

¶11 The trial court heard argument from the parties on Henderson's motion and then recessed to review *Hursey*, which involved the disqualification of a prosecutor who had formally represented a defendant in a prior criminal matter. 176 Ariz. at 331. Reading portions of *Hursey* into the record, the trial court noted that "[t]he mere fact of confidential communications in the prior relationship is enough to presume prejudice to the defendant." *Id.* at 334. The court acknowledged, however, that Beauchamp's prior representation of Henderson involved an annulment rather than a criminal matter and that Henderson "hasn't really shown that there was some confidential communication that has now prejudiced her here." Nonetheless, the court felt bound to follow *Hursey* and assume prejudice to Henderson that warranted disqualification of the entire GCAO.

¶12 The State petitioned for special action review, but the court of appeals declined to accept jurisdiction in a split decision. We granted review to clarify our holding in *Marner* and to consider whether the trial court abused its discretion in disqualifying the entire GCAO by finding an appearance of impropriety without first finding that a substantial relationship existed between the prior representation and the current prosecution. The disqualification of a prosecutor's office is also a matter of statewide importance and is likely to recur. We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution.

## II. DISCUSSION

¶13         We apply an abuse of discretion standard to a trial court's decision to disqualify counsel.   *Marner*, 251 Ariz. at 200 ¶ 8.   However, "[w]e review conclusions of law de novo."   *Id.*   "An error of law in reaching a discretionary conclusion may constitute an abuse of discretion." *State v. Thompson*, 252 Ariz. 279, 290 ¶ 26 (2022).

### A.   Our Holding In *Marner*

¶14         We begin by clarifying our holding in *Marner*.   Henderson argued before the trial court on her renewed motion that *Marner* represented an issue of first impression concerning an extension of the four-factor *Gomez* inquiry to disqualify a prosecutor's office based on an appearance of impropriety.   According to Henderson, *Marner* "is the first time the Supreme Court has said an appearance of impropriety by itself is enough to kick an entire prosecuting agency off of the case."   The State argued that *Marner* merely reiterated the analysis previously set forth in *Gomez*.

¶15         While Henderson may have accurately characterized *Marner*'s result, that characterization is not what made *Marner* a case of first impression.   We stated that "[b]efore us is an issue of first impression for this Court: whether an appearance of impropriety, *arising from a prosecutor's actual misconduct*, may be imputed to disqualify an entire prosecutor's office."   *Marner*, 251 Ariz. at 199 ¶ 1 (emphasis added).   Thus, the issue of first impression in *Marner* was whether actual misconduct required disqualification of an entire prosecutor's office, not the use of the *Gomez* factors to address an actual or alleged appearance of impropriety.

¶16         Although we did say in *Marner* that this Court had never applied *Gomez* beyond the actual conflict of interest or misconduct contexts, we noted that *Gomez* "held that [an] appearance of impropriety 'survives as a part of conflict of interest.'"   *Marner*, 251 Ariz. at 200 ¶ 10 (quoting *Gomez*, 149 Ariz. at 225).   We then clarified that the *Gomez* factors are to be used "whenever a defendant seeks to disqualify an entire prosecutor's office, regardless of whether the basis for the motion is a conflict of interest,

misconduct, or appearance of impropriety." *Id.* ¶ 11. *Marner* thus did not represent an "extension" of *Gomez* to matters involving an appearance of impropriety. It simply restated the circumstances in which the factors are to be used. Furthermore, *Marner* does not stand for the proposition that an allegation of an appearance of impropriety may, on its own, call for the disqualification of an *entire* prosecutor's office. *See also Gomez*, 149 Ariz. at 225 (stating that "[i]t does not necessarily follow that [an appearance of impropriety] must disqualify [a prosecutor] in every case").

¶17 The trial court accurately noted in the rehearing that what we said in *Marner* confirmed the analysis that it was required to consider—and did consider—in denying Henderson's first motion to disqualify. Nevertheless, the court concluded that *Hursey* required disqualification of GCAO because "[t]he mere fact of confidential communications in the prior relationship is enough to presume prejudice to the defendant." 176 Ariz. at 334. Based on *Hursey*, it found an appearance of impropriety and granted Henderson's motion to disqualify GCAO without considering the *Gomez* factors or determining whether a substantial relationship existed between the matters in question—unlike what the court did in the first hearing. This was error. Because the trial court did not do so, as in *Marner*, we review the *Gomez* factors to determine whether the trial court abused its discretion in granting Henderson's renewed disqualification motion.

## B. Application Of *Gomez* Factors

### 1. Harassment

¶18 The first *Gomez* factor, "whether the motion is being made for the purposes of harass[ment]," *Gomez*, 149 Ariz. at 226 (quoting *Alexander v. Superior Court*, 141 Ariz. 157, 165 (1984)), is not at issue in this case.

### 2. Damage to movant

¶19 The parties focus their arguments on the second factor: "whether the party bringing the motion will be damaged in some way if the motion is not granted." *Id.* (quoting *Alexander*, 141 Ariz. at 165). The

gravamen of the trial court's analysis in both the first hearing and the rehearing was whether Henderson would be prejudiced by GCAO's continued prosecution. As noted, the court presumed in the rehearing that, based on *Hursey*, Henderson would be prejudiced.

**¶20** In *Hursey*, the prosecutor alleged the defendant's two prior convictions to enhance the sentence. 176 Ariz. at 331. Problematically, the prosecutor had served as the defendant's attorney in those very same cases. *Id.* After the jury found the defendant guilty, the prosecutor apparently recognized the problem with his prior representation and called on a different deputy county attorney to prove the existence of the two prior convictions. *See id.* The issue before the Court concerned whether the prior representation of the defendant should have resulted in the prosecutor's disqualification from the case entirely. *Id.* at 332. The Court found *In re Ockrassa,* 165 Ariz. 576 (1990), dispositive. *Hursey*, 176 Ariz. at 332.

**¶21** *Ockrassa* involved a defendant facing his third driving under the influence ("DUI") charge. 165 Ariz. at 576. The prosecutor had served as the defense attorney in the two previous DUIs alleged as predicate offenses. *Id.* Finding that the prior DUI convictions were at issue in the pending prosecution, the Court concluded that the matters were substantially related and that the prosecutor had violated ER 1.9, stating:

> We do not believe that, *in the context of multiple DUI offenses*, a "substantial relationship" is established only if the prior conviction is an element of the subsequent offense. One of the aims of ER 1.9 is to protect the client. . . . Respondent's conduct in prosecuting [his former client] created a substantial danger that confidential information revealed in the course of the attorney/client relationship would be used against [the former client] by . . . his former attorney.

*Id.* at 578 (emphasis added) (internal citation omitted).

**¶22**        The *Hursey* court likewise concluded:

> The facts in this case are similar; the prior convictions were "directly in issue," and the prosecutor should have disqualified himself from the prosecution. It is not enough that the prosecutor had a colleague prove the prior convictions; the prosecutor remained in charge of the prosecution, and the "substantial danger that confidential information revealed in the course of the attorney/client relationship would be used against [the defendant]" was still present.

176 Ariz. at 332 (alteration in original).   Although the facts of *Hursey* are readily distinguishable from Henderson's case, *Hursey* underscores the principle that a presumption of prejudice based on confidential communications to support disqualification requires a finding that the matters in question are substantially related.   In granting Henderson's motion, the trial court did not engage in such an analysis, which was error.

**¶23**        The "substantially related" standard is grounded in the Rules of Professional Conduct.   *See* Ariz. R. Sup. Ct. 42; *see also State v. Sustaita*, 183 Ariz. 240, 241–42 (App. 1995).   ER 1.9(a) prohibits a lawyer from representing a client in a matter that is "materially adverse to the interests of [a] former client" when the lawyer represented the former client in "the same or a substantially related matter."   ER 1.11(c)(1) forbids a lawyer who is a public officer from participating "in a matter in which the lawyer participated personally and substantially while in private practice."   *See also State ex rel. Romley v. Superior Court*, 184 Ariz. 223, 228 (App. 1995) ("The inquiry under ER 1.11(c) is whether the attorney personally and substantially participated in the matter for which the prosecutor is seeking to hold the defendant accountable.").

**¶24**        The defendant bears the burden of proving such a substantial relationship.   *See Alexander*, 141 Ariz. at 161 ("The burden should be upon the moving party to show sufficient reason why an attorney should be disqualified from representing his client."); *Amparano v. ASARCO, Inc.*, 208 Ariz. 370, 378 ¶¶ 31-33 (App. 2004) (affirming the trial court's holding that former representation and the present matter were not "substantially

related" because the attorney's access to former client's information was too speculative and the former client failed to carry its burden to show the prior work was substantially related to the present action).

**¶25**        Unremarkably, Arizona courts have found a substantial relationship where a criminal defense attorney ceased representing his client to work for the government agency engaged in the ongoing prosecution.   *See Turbin v. Superior Court*, 165 Ariz. 195, 199 (App. 1990) (affirming disqualification of the Navajo County Attorney's Office where a defendant's criminal defense attorney withdrew mid-representation to join the Office); *see also State v. Latigue*, 108 Ariz. 521, 522–23 (1972) (finding a substantial relationship when deputy public defender who worked as co-counsel for the defendant left to become chief deputy county attorney for the prosecuting agency).   As noted previously, this Court has also found a substantial relationship when an attorney prosecutes someone who was formerly their client, and the subsequent prosecution is a different matter but akin to "switching sides."   *Ockrassa*, 165 Ariz. at 578–79. However, we limited this principle to scenarios involving crimes of the same type.   *Id.* at 579 (considering representation on a DUI and then prosecuting a subsequent, separate DUI as more "akin to 'switching sides'" than if a subsequent prosecution involved forgery).

**¶26**        Obtaining a marriage annulment and prosecuting a drug crime are two very different matters without any factual nexus.   The only similarity is that Henderson was married to Roberts at the time she sought an annulment of her previous marriage and was later questioned about Roberts' affiliation with the AB after her drug arrest.   The annulment representation and the current prosecution thus are not the same or substantially related and the current prosecution is not even remotely akin to switching sides.

**¶27**        Nonetheless, Henderson argues that she may have given Beauchamp confidential information relating to Roberts' AB involvement during his representation of her and that this contributed to the harsh

10

charges and lack of a more lenient plea offer.[3]   However, she does not point to any specific confidential communication.   In fact, throughout her testimony in the initial hearing on disqualification, she repeatedly stated she could not remember sharing any specific information.   Consequently, because there is no basis upon which to conclude that Henderson shared any confidential information with Beauchamp that is relevant or remotely related to the instant prosecution, *Hursey* does not control for purposes of presuming prejudice based on confidential communications from the prior representation.   Ultimately, Henderson has not provided evidence that she would be "damaged" if her motion to disqualify GCAO was not granted.

**¶28**        Before considering the third factor, we note that the State argues the substantial relationship inquiry should be the only step in the disqualification analysis.   However, we made clear in *Marner* that, when a defendant seeks disqualification based on an appearance of impropriety, a trial court should consider all "these factors," not just one.   Part II.A.   And the substantial relationship inquiry may not always be significant.   For example, in *Marner*, actual misconduct served as a basis for finding prejudice to the defendant.   251 Ariz. at 201 ¶ 15.

### 3.   Alternative solutions

**¶29**        The third factor addresses "whether there are any alternative solutions, or [if disqualification is] the least damaging [option] under the circumstances."   *Gomez*, 149 Ariz. at 226 (quoting *Alexander*, 141 Ariz. at 165).   This factor recognizes that disqualifying an entire prosecutor's office is a drastic remedy that should be undertaken only where no lesser alternative would cure the problem.   Given the incongruent nature of an annulment and a prosecution for the sale of drugs and Henderson's failure to marshal any evidence of confidential communications during the prior

---

[3] Additionally, the State noted in the renewed motion hearing that the information regarding the AB was known to law enforcement prior to the annulment matter based on an investigation of Henderson in 2003.   *See Alexander*, 141 Ariz. at 163 (observing that information in the public record is not privileged).

representation, we are not persuaded that there is a problem in need of an "alternate solution."

### 4. Public suspicion

**¶30**        Finally, the fourth factor concerns whether "the possibility of public suspicion will outweigh any benefits that might accrue due to continued representation."   *Id.* (quoting *Alexander*, 141 Ariz. at 165).   The record here does not reflect that risk.   As the trial court noted in the first hearing, "the most obvious way of looking at public suspicion in a situation like this, is that . . . the County Attorney would give some sort of preferential treatment to a former client."   That is certainly not the case here, where Henderson argues she has been given a harsh plea offer. More persuasively, the prior representation in question was brief and occurred in a completely unrelated matter ten years prior.   Therefore, we find no basis for any public suspicion of GCAO's continued prosecution of Henderson, let alone that such suspicion could "outweigh any benefits that might accrue due to continued representation."   *See id.* (quoting *Alexander*, 141 Ariz. at 165).

## III. CONCLUSION

**¶31**        Henderson alleged an appearance of impropriety in the current prosecution premised solely on the fact that the Gila County Attorney previously represented her in a marriage annulment matter.   For the reasons stated, there is no substantial relationship between the matters upon which to conclude that Henderson would be prejudiced by GCAO's continued prosecution.   Based on our analysis under the *Gomez* factors, we vacate the order disqualifying GCAO and reinstate GCAO as the prosecuting agency.